## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                             )
KEENAN JOHNSON,              )
                             )
          Plaintiff,         )
                             )
     v.                      )      Civil Action No. 98-1618 (RWR)
                             )
JAMES H. BILLINGTON,        )
                             )
          Defendant.         )
_____)
```

## MEMORANDUM OPINION AND ORDER

Plaintiff Keenan Johnson, a former employee of the Library
of Congress ("the Library") alleges in a two-count complaint that
the defendant, the Librarian of Congress, violated the Americans
with Disabilities Act, 42 U.S.C. §§ 12101-213 (2000) ("ADA").
Specifically, Johnson, who has bipolar disorder, claims that the
defendant failed to accommodate his disability, and also
intentionally discriminated against him by harassing him due to
his disability and damaging his professional reputation.
Defendant has moved to dismiss the complaint for plaintiff's
failure to exhaust his administrative remedies timely and to
amend the answer to add an affirmative defense of failure to
exhaust administrative remedies.  Because defendant has waived
the defense by failing to assert it timely, the motion to amend
and the motion to dismiss will be denied.  Defendant has also
moved for summary judgment, arguing that plaintiff failed to make
a prima facie showing of discrimination.  Because the plaintiff

has made out a prima facie case as to both counts and because there are genuine disputes between the parties about material facts, defendant's motion will be denied.  In addition, plaintiff has moved for partial summary judgment, arguing that a finding of disability by the Department of Labor relating to his application for workers' compensation benefits is conclusive as to the issue of disability so that only damages are at issue in this suit. Because the issue of liability is a contested material issue and because the finding by the Department of Labor has no legally preclusive effect in this forum, plaintiff's motion will be denied.

## BACKGROUND

Johnson started working at the Library in September 1991. (Def.'s Stmt. Material Facts as to Which There is No Genuine Issue ("Def.'s Stmt.") ¶ 1.)  In March 1993, he was promoted and began reporting to Lesia Bodnaruk.  Bodnaruk's supervisor was Tamara Swora.  (<u>Id.</u> ¶ 2.)  Plaintiff alleges that Bodnaruk was an abusive supervisor and that as a result of the hostility and mistreatment both she and Swora directed toward him, his mental health destabilized.  (Pl.'s Mem. Supp. Partial Summ. J. ("Pl.'s Mem.") at 1.)  On July 12, 1994, Johnson's doctor wrote in a letter to the Library's doctor that the plaintiff suffered from bipolar disorder and had been diagnosed with that condition in 1989.  The letter informed the defendant that plaintiff's work

situation was causing him stress at such a level that he needed
one week of leave to "regroup his coping skills."  (Pl.'s Stmt.
of Undisputed Facts Supp. Partial Summ. J. ("Pl.'s Stmt.")
Ex. 2.)  Defendant granted the plaintiff one week of leave.
(Def.'s Stmt. ¶ 3.)

The letter also said that in the doctor's opinion, Johnson
should be permanently reassigned because his working situation
could "seriously jeopardize his mental health."  (Pl.'s Stmt.
Ex. 2.)  When the plaintiff returned from sick leave, he was
temporarily detailed to a different assignment so that he would
not have to report to Bodnaruk.  (Def.'s Stmt. ¶ 4.)  Plaintiff
alleges, however, that his work area was still located near the
area where Bodnaruk and Swora worked so that he was still exposed
to the abusive atmosphere that he alleges those individuals
fostered.  (Pl.'s Mem. at 4-5.)  Specifically, plaintiff alleges
that the supervisors' hostile conduct intensified after he
requested a transfer (id. at 21), and that Bodnaruk and Swora
refused to speak with him and encouraged others to ignore him as
well.  As a result, communication occurred through notes left on
his chair.  (Id. at 20.)  Plaintiff also alleges that Bodnaruk
harassed him by "making disparaging remarks about him and
particularly about his medical condition" while he was within
earshot.  (Id. at 5.)  Plaintiff avers that Bodnaruk set out to
ruin his reputation at the Library and thereby limited his career

-4-

opportunities there.  Finally, plaintiff states that Bodnaruk

hindered his work productivity by failing to adequately respond

to his requests for supplies, fax codes and workspace.  (<u>Id.</u>)

In February 1995, Johnson requested that he be permanently

transferred out of the group and area in which Bodnaruk and Swora

worked.  (Pl.'s Stmt. at 12.)  Over the course of the next three

months, at the defendant's request, plaintiff provided defendant

with medical documentation to support the plaintiff's claim that

he needed a permanent transfer.  (Pl.'s Stmt at 12-15.)  In April

1995, the Library's doctor sought from plaintiff's doctor

additional medical information to support the plaintiff's request

for a permanent reassignment.  (Pl.'s Stmt. Ex. 15.)  Plaintiff's

doctor responded that the plaintiff reported that his supervisor

was causing him stress because she behaved in a demeaning and

antagonistic way toward him.  Plaintiff's doctor recommended that

the plaintiff "should not be positioned in an unstable work

environment" if and when he was reassigned, but that he would be

able to perform his job without special accommodations.  (<u>Id.</u>

Ex. 16.)

On May 4, 1995, Johnson was informed that he would not be

permanently transferred but rather would be required to return on

May 20, 1995, to his previous position working for Bodnaruk.

Defendant acknowledged at that time that some modifications would

be necessary in order to assure a smooth working environment.

-5-

(Def.'s Stmt. ¶ 8.)  The plaintiff left work that day and did not return until August 28, 1995.  (Pl.'s Stmt. at 16.)

Plaintiff states that from May 4, 1995 to August 28, 1995, he suffered "the worst depressive episode of his life" due to the Library's decision to deny his reassignment request.  (Pl.'s Mem. at 8.)  This episode interfered with his ability "to think, concentrate, care for himself, and work."  (Id.)  Defendant placed the plaintiff on leave without pay from May 5 through June 15, 1995.  (Def.'s Stmt. ¶ 11.)  On June 15, 1995, the Library wrote a letter to the plaintiff indicating that he would be considered absent without leave from that date forward until further documentation of his medical status was received.  (Id. Ex. 1 Attach. 6.)  In response, plaintiff wrote a letter to the Library indicating that he wished his status to be continued as leave without pay and further stating that he had retained legal counsel in connection with this ongoing employment dispute.  (Id. Ex. 1 Attach. 8.)

On August 10, 1995, plaintiff contacted the Library's Equal Employment Opportunity Complaints Office ("EEOCO") and filed a complaint regarding his employer's failure to accommodate his disability by refusing his transfer request.  (Id. Ex. 4.)  On August 28, 1995, Johnson returned to his old position.  (Pl.'s Stmt. Ex. 7 at 1; Def.'s Stmt. ¶ 13.)  By then, Bodnaruk and Swora were no longer supervising his position and at no time

-6-

after his return to work in August 1995 was he required to deal with them.  (Pl.'s Mem. at 8-9.)  He remained there, apparently without further incident, until December 3, 1997, when he voluntarily left to take another job.  (Def.'s Stmt. ¶ 13.) Plaintiff filed a workers' compensation claim with the Department of Labor, submitting approximately 100 pages of medical records in support, and was awarded workers' compensation benefits. (Def.'s Stmt. ¶ 15 & Ex. 2, ¶ 11.)

<u>DISCUSSION</u>

I.   THE MOTIONS TO DISMISS AND TO AMEND

Defendant has moved to dismiss the complaint arguing that plaintiff's claim is time-barred.  In addition, defendant has filed a motion to amend his answer to add a parallel defense that plaintiff failed to timely exhaust his administrative remedies.

Under the ADA, the Librarian of Congress is empowered to enact regulations governing discrimination complaints by employees.  <u>See</u> 42 U.S.C. § 12209(5).  Under that authority, the Library established its EEOCO which in turn promulgated regulations to govern ADA complaints.  The regulations in force in 1995 required plaintiff to "notify and consult with a Counselor [in the EEOCO] not later than 20 workdays after the date of the alleged discriminatory matter."  Library of Congress Regulation 2010-3.1 § 4a.  (Def.'s Mem. in Supp. of Mot. to Dismiss or, in the Alternative, for Summ. J. ("Def.'s Mem.")

-7-

at 2, 9 & Ex. 12; Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply") at 4-7.)  On May 4, 1995, plaintiff learned that the Library had denied his request for a permanent reassignment, but he did not consult with an EEO officer until August 10, 1995, more than the 20 workdays allowed by regulation.

Administrative time limits operate as statutes of limitations on administrative complaints.  See Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997).  The purpose of these time limits is to ensure that complaints are investigated when the facts giving rise to them are still fresh in the minds of the participants.  See id. at 438.  Time limits also ensure that longstanding expectations about the consequences of events are not unsettled.  See id.  Because these time limits are not jurisdictional, they are subject to such ameliorative doctrines as equitable tolling and waiver, which can operate to avoid dismissal of a suit when the administrative complaint is not filed within the allowed time.  See id. at 437.  Principles of equitable tolling apply in employment discrimination suits against the government.  See Chung v. Dep't of Justice, 333 F.3d 273, 276 (D.C. Cir. 2003).

Failure to exhaust administrative remedies is considered an affirmative defense.  See Bowden, 106 F.3d at 437.  As such, "the defendant bears the burden of pleading and proving it."  Id. Once the defendant properly pleads and proves that the plaintiff

-8-

failed to exhaust administrative remedies, the burden shifts back to the plaintiff to prove "facts supporting equitable avoidance of the result."  Id.  The ultimate issue for a court engaged in an equitable tolling analysis is "whether equity requires extending a limitations period."  Smith-Haynie v. District of Columbia, 155 F.3d 575, 579 (D.C. Cir. 1998).  Application of the doctrine of equitable tolling is solely within the judge's discretion.  See id.

A defendant waives the exhaustion defense by failing to raise it in a timely fashion.  See Bowden, 106 F.3d at 438. Failure to plead the defense in an answer is not dispositive as to waiver, as a defendant may be able to amend the answer under Federal Rule of Civil Procedure 8.  However, when a complaint has proceeded through administrative channels prior to arriving at the federal courthouse, and the agency has accepted, investigated and decided that complaint on its merits without raising the exhaustion issue, the exhaustion defense may be found to have been waived.  See Bowden, 106 F.3d at 438-39.

Expressly relying on Bowden, 106 F.3d at 439-49, plaintiff argues that the defendant has waived his right to assert an exhaustion defense by failing to raise this issue at all in the administrative proceedings and by failing to raise it here until filing his reply to the plaintiff's opposition to defendant's

-9-

motion to dismiss.[1]  The facts of <u>Bowden</u> are somewhat

---

[1] Plaintiff advances two additional arguments as to why his
failure to exhaust administrative remedies in a timely manner
should be overlooked.  First, plaintiff argues that the
discrimination in this case involved a continuing violation.
However, plaintiff admits that a theory of continuing violation
would start the twenty-day clock on May 4, 1995, the date of the
last act of discrimination.  (Pl.'s Opp'n at 6.)  Plaintiff did
not file his EEOCO complaint until August 10, 1995, well beyond
twenty days after May 4, 1995.  The continuing violation theory
therefore does not defeat the defendant's exhaustion defense.
    Plaintiff's second argument is that the time between May and
August 1995 should be equitably tolled because he was so ill
during that time that he was unable to protect his legal rights.
His treating physician, Dr. Mihael H. Polymeropoulos, states in
an affidavit that from May 4, 1995 until August 28, 1995, the
plaintiff's ability to handle his own affairs was greatly
degraded, that plaintiff was disoriented as to place and time and
unable to care for himself, and that the doctor seriously
considered hospitalizing the plaintiff during this time due to
these symptoms.  (Pl.'s Opp'n Ex. 21 ¶ 6.)  The doctor also
states that while Johnson had "periods of greater clarity and
awareness" during that summer, these periods were short-lived.
(<u>Id.</u>)  Plaintiff's own affidavit avers that this period was "the
worst and most devastating clinical depression" he had ever
experienced, and that he "lost [his] appetite, could not complete
thoughts and was often forgetting things."  (Pl.'s Stmt. Ex. 1
¶ 18.)
    Defendant counters by pointing out that plaintiff was lucid
enough during this time period to respond to a letter from his
employer.  (<u>Id.</u> Ex. 1 Attach. 8.)  In his letter, plaintiff
described his current condition, asked that his status be
continued as leave without pay, and stated that he had hired
legal counsel to address the ongoing legal dispute with the
defendant.  (<u>Id.</u>)  This evidence does suggest that plaintiff
experienced a major psychiatric episode with significant
attendant difficulties.  However, plaintiff's ability to respond
quickly and lucidly to the letter from his employer, combined
with his statement that he had hired a lawyer to represent him on
the matter of his employment dispute, substantially undercuts his
argument that he was so incapacitated for that entire period that
he could not have protected his legal rights.  <u>See</u> <u>Bowden</u>, 106
F.3d at 437 (stating that the plaintiff bears the burden of
proving that administrative time-limits should be tolled).  This
is particularly so given that plaintiff seems to have been in the
process of retaining legal counsel in mid-June.  <u>See</u> <u>Lopez v.</u>

-10-

distinguishable from those in this case.  In <u>Bowden</u>, the
defendant appears to have raised the exhaustion defense at an
even later stage of the proceedings than the defendant has in
this case.  <u>See</u> <u>id.</u> at 436.  Further, in <u>Bowden</u>, the defendant
had made a series of inconsistent arguments in various forums in
order to create "a jurisdictional merry-go-round" designed to
keep the plaintiff's case from ever being heard on the merits.
<u>Id.</u> at 439.  Defendant in this case has engaged in no such
inequitable conduct.

Nevertheless, <u>Bowden</u> states that when an agency is able to
investigate a case in a timely fashion, before evidence is stale
or lost and before expectations about the consequences of the
actions at issue are settled, "[the agency] has no legitimate
reason to complain about a judicial decision on the merits."  The
Library has fully investigated the claim and has adjudicated the
merits of the claim.  No mention was made of lack of timeliness
when the claim was filed at the EEOCO, nor when a decision was
issued by that office, nor even when the case was filed and
answered in this court.  Plaintiff's claim was not stale at the
time the agency proceeded and no argument has been made to that

_____

<u>Citibank</u>, 808 F.2d 905, 906 (1st Cir. 1987) (upholding the
district court's decision not to toll the limitations period in
part due to the fact that the plaintiff had been represented by
an attorney during part of the period of his claimed incapacity).
Equitable tolling is inappropriate in these circumstances.

effect.  Nor does litigation of this case on the merits unsettle expectations.  Thus, the policy behind enforcing the exhaustion defense does not support doing so in this case.  Because the defendant has waived his exhaustion defense by not asserting it timely, his motion to dismiss the complaint as time-barred will be denied and his motion to amend the answer to add this defense will be denied as futile.  See James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) (citing Foman v. Davis, 371 U.S. 178, 181-82 (1996)) (stating that a motion to amend need not be granted if such amendment would be futile) (other citations omitted).

II.  MOTIONS FOR SUMMARY JUDGMENT

Defendant has moved for dismissal or summary judgment regarding both the failure to accommodate claim and the intentional discrimination claim.[2]  Plaintiff has filed a motion for partial summary judgment on the issue of liability, arguing that the Department of Labor has already determined that plaintiff has a disability.

Summary judgment is appropriate if the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[2] Because information submitted by both parties outside the pleadings will be considered, the defendant's motion will be treated as a motion for summary judgment.  See Fed. R. Civ. P. 12(b).

-12-

genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" <u>Burke v. Gould</u>, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  A material fact is one "which might affect the outcome of the suit under governing law." <u>Anderson</u>, 477 U.S. at 248.  A court "examine[s] the facts in the record and reasonable inferences in the light most favorable to the nonmoving party, but do[es] not accept bare conclusory allegations as fact." <u>Taylor</u>, 132 F.3d at 762 (citation omitted).

The ADA prohibits an employer from discriminating against "qualified individuals with a disability because of their disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." <u>Sutton v. United Air Lines</u>, 527 U.S. 471, 477-78 (1999).

> A "qualified individual with a disability" is
> identified as "an individual with a disability who,
> with or without reasonable accommodation, can perform
> the essential functions of the employment position that
> such individual holds or desires.  [42 U.S.C.]
> § 12111(8).  In turn, a "disability" is defined as:
>     "(A) a physical or mental impairment that
>     substantially limits one or more of the major
>     life activities of such individual;
>     "(B) a record of such an impairment; or
>     "(C) being regarded as having such an impairment."
> [42 U.S.C.] § 12102(2).

<u>Id.</u> at 478.

-13-

> The term "substantially limits" means, among other
> things, "[u]nable to perform a major life activity that
> the average person in the general population can
> perform"; or "[s]ignificantly restricted as to the
> condition, manner or duration under which an individual
> can perform a particular major life activity as
> compared to the condition, manner, or duration under
> which the average person in the general population can
> perform that same major life activity."  § 1630.2(j).
> Finally, "[m]ajor [l]ife [a]ctivities means functions
> such as caring for oneself, performing manual tasks,
> walking, seeing, hearing, speaking, breathing,
> learning, and working."  § 1630.2(i).

Id. at 480 (quoting the EEOC's regulations, codified at 29

C.F.R.) (alterations in the original).  A person with an actual

impairment that is wholly corrected or wholly mitigated is not

disabled under the ADA because the impairment would not

substantially limit a major life activity.  Id. at 482-83.

However, the use of medication or a corrective device to mitigate

the impairment

> does not, by itself, relieve one's disability.  Rather,
> one has a disability under [42 U.S.C. § 12102(2)]
> subsection (A) if, not withstanding the use of a
> corrective device, that individual is substantially
> limited in a major life activity.  For example,  . . .
> individuals who take medicine to lessen the symptoms of
> an impairment so that they can function [may]
> nevertheless remain substantially limited.  . . .  The
> use or nonuse of a corrective device does not determine
> whether an individual is disabled; that determination
> depends on whether the limitations an individual with
> an impairment actually faces are in fact substantially
> limiting.

Id. at 488 (emphasis in the original).  Furthermore,

> an intermittent impairment that is a characteristic
> manifestation of the underlying admitted disability is
> . . . a part of the underlying disability and hence a
> condition that the employer must reasonably

-14-

> accommodate.  Often the disabling aspect of a
> disability is, precisely, an intermittent manifestation
> of the disability rather than the underlying
> impairment.

Vande Zande v. Wis. Dep't of Admin., 44 F.3d 538, 544 (7th Cir.
1995) (finding that episodic pressure ulcers requiring several
weeks' absence from work periodically was part of the paralyzed
plaintiff's disability that required reasonable accommodation).

A.   Defendant's Motion

1.   Failure to Accommodate under the ADA

To survive a motion for summary judgment on a reasonable
accommodation claim, a plaintiff must first produce evidence from
which a reasonable jury could conclude that he suffered from an
impairment that substantially interfered with a major life
activity.  Then, a plaintiff who is qualified for the job – – a
matter not in dispute in this case – – is entitled to have the
employer take "reasonable steps to accommodate [the] employee's
disability unless the steps in question would impose an undue
hardship."  Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1300
(D.C. Cir. 1998) (quotations omitted).  Undue hardship in turn
means "an action requiring significant difficulty or expense"
when considered in light of a number of factors including the
nature of the requested accommodation and the nature and size of
the employer's business.  42 U.S.C. § 12111(10).  Reasonable
accommodation may include reassignment to a vacant position.  See
42 U.S.C. § 12111(9)(B).

-15-

Johnson asserts he is an individual with a disability – – a
diagnosed chronic bipolar disorder – – that substantially
interferes with his ability to think, concentrate, care for
himself, interact with others, and to work.  (Pl.'s Mem. at 11.)
Johnson claims that the Library's failure to permanently place
him in another work space away from the alleged hostile
environment constitutes a failure to accommodate his disability.
(Pl.'s Mem. at 4, 15.)  Defendant counters in the first instance
that plaintiff has failed to make a prima facie showing that he
is a disabled individual under the ADA.  In addition, defendant
argues that during his employment, plaintiff failed to provide
medical documentation to establish that an accommodation was
necessary, and therefore, his claim that the Library failed to
accommodate his disability must now be rejected.  (Def.'s Mem.
at 15-16.)

Bipolar disorder, as described by the plaintiff, is an
impairment under the ADA.  See Duda v. Board of Educ. of Franklin
Park Public Sch. Dist. No. 84, 133 F.3d 1054, 1059 (7th Cir.
1998) (citing EEOC guidelines and collecting cases recognizing
bipolar disorder as an impairment).  Even if the condition is
treated by medication, as is true in Johnson's case, the
individual may still qualify as disabled under the ADA if he
remains substantially impaired.  Sutton, 527 U.S. at 488
("individuals who take medication to lessen the symptoms of an

impairment so that they can function" may "nevertheless remain
substantially impaired").  During the period of his employment
with the defendant, symptoms of plaintiff's disability twice
caused him to take leave from his job.  (Pl.'s Mem. at 4, 7-8.)
The symptoms described by the plaintiff, including disorientation
as to place and time, inability to care for oneself, loss of
appetite, and inability to complete thoughts, and information
provided by his treating physician, are evidence that the major
life activities of thinking, caring for oneself, and working were
in fact substantially limited by his bipolar disorder on at least
two occasions.  The findings of the Department of Labor also
provide evidence of the existence of the disability.

Defendant likens this case to Duncan v. Wash. Metro. Area
Transit Auth., 240 F.3d 1110 (D.C. Cir. 2001), and argues that
Duncan controls this case.  (Def.'s Notice of Supp. Authority and
Supp. Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Supp.
Authority") at 1.)  Duncan, however, does not support defendant's
argument.  The plaintiff in Duncan was assigned to a job that
required him to lift items weighing 100 pounds or more.  After
injuring his back, Duncan sought a job involving only light
lifting.  240 F.3d at 1113.  The court concluded that when an ADA
plaintiff asserts as a disability "an impairment that
substantially limits the major life activity of working," 240
F.3d at 1114, he must "produce some evidence of the number and

types of jobs in the local employment market to show he is disqualified from a substantial class or broad range of jobs." Id. at 1115-16.  In contrast to the plaintiff in Duncan, plaintiff here asserts that his disability interferes with not just one, but multiple major life activities, namely, his ability to think, concentrate, care for himself, interact with others, and work.  (Pl.'s Mem. at 11.)  For example, plaintiff claims that during the summer of 1995, he was at times unable to tell night from day.  (Pl.'s Stmt. Ex. 1 at 8.)  Johnson's claimed disability is not limited to the major life activity of work, and therefore Duncan does not control.  If a jury credits Johnson's or his physician's descriptions of Johnson's disability and the extent to which it interfered with his ability to think, concentrate and care for himself, Johnson's disability would substantially interfere with virtually any job, not just the job he held, or a narrow range of jobs, as was the case in Duncan. At this stage, the evidence is not insufficient to support the plaintiff's claim that he was and is disabled under the ADA.

Defendant also argues that the plaintiff was not disabled under the ADA because his disability was temporary, lasting only from May 4, 1995 to August 10, 1995.  Defendant reasons that even if the plaintiff suffered from bipolar disorder, that disorder could not substantially interfere with a major life activity because it lasted only four months.

-18-

Plaintiff has a well-documented history of bipolar disorder since 1989.  (Pl.'s Stmt. Ex. 2.)  Defendant's view of plaintiff's disability ignores the teaching of Sutton, where the Supreme Court acknowledged that medication may partially, but not wholly, relieve an impairment that substantially limits a major life activity, and expressly rejected the notion that partial amelioration of a disabling condition renders the individual ineligible for protection under the ADA.  Sutton, 527 U.S. at 488; accord Vande Zande, 44 F.3d at 544 (holding that the periodic characteristic disabling manifestation is part of the underlying recognized disability).

In addition, contrary to the defendant's view, there is ample evidence in the record to suggest that the plaintiff's bipolar disorder interfered with his life with some regularity. First, plaintiff took a one-week leave of absence in July 1994, prompted by plaintiff's clinical depression.  (Pl.'s Stmt. at 5 & Ex. 2; Def.'s Stmt. ¶ 3.)  Second, in 1995, the plaintiff was on leave for three and one-half months due to his disorder.  (Def.'s Stmt. ¶ 10-11.)  Plaintiff alleges that during this period he suffered a major depressive episode which left him unable to care for himself or work.[3]  (Pl.'s Mem. at 8.)  Third, as the

---

[3]  Plaintiff's assertion that his disorder interfered with his life regularly is not defeated by the finding that at one point in 1995, he was sufficiently able to perform acts to protect his legal rights.  See n.1 supra.

defendant himself describes, the plaintiff's medical records indicate that the plaintiff's mental status varied widely from October 1994 through March 1995.  (Def.'s Mem. at 17 and Ex. 3.) In January 1995, plaintiff plunged into depression.  (Id. Ex. 3 at 6.)  In March 1995, plaintiff's condition began to interfere with his ability to sleep.  (Id. at 7.)  In sum, plaintiff has offered sufficient evidence from which a jury could find that the plaintiff's condition and its effect on his major life activities was more than temporary.

Defendant argues that he could not have known that a reasonable accommodation was necessary and, therefore, is not responsible for any alleged failure to provide one.  Pointing to the communications from Johnson's doctors, defendant asserts that the information he received about Johnson's condition did not support a conclusion that a reasonable accommodation was necessary.  Further, defendant notes that plaintiff did not provide full medical documentation in support of his disability accommodation request, but provided far more medical documentation to the Department of Labor for his workers compensation claim than he provided to defendant.  (Def.'s Mem. at 16.)

Plaintiff counters that defendant knew of plaintiff's bipolar diagnosis in July 1994 at the latest, by virtue of his doctor's letter to the Library stating that plaintiff had a "well

-20-

documented history of Bipolar Disorder since 1989." (Pl.'s Mem.
at 4; Pl.'s Stmt. Ex. 2.)  The letter further "strongly
recommended that he be transferred permanently from his present
work" in order to avoid "seriously jeopardiz[ing] his mental
health."  (Id.)  Plaintiff also points to a letter written by his
doctor on April 11, 1995, stating that Johnson's supervisors'
conduct toward Johnson was causing Johnson undue stress and that,
in considering reasonable accommodations for the plaintiff's
future work placement, the Library should avoid placing him "in
an unstable work environment." (Pl.'s Stmt. Ex. 16.)  Taking the
evidence in the light most favorable to the plaintiff, a
reasonable jury could find that the plaintiff was disabled and in
need of accommodation and that defendant had sufficient notice of
his need at the time of the decision not to grant plaintiff's
transfer request.

Defendant also maintains that plaintiff's requested
accommodation was unreasonable per se, arguing that the plaintiff
is essentially complaining about a personality conflict with his
supervisors and that the ADA does not require employers to
guarantee workers a stress-free work place.  (Def.'s Mem. at 18-
19.)  Although the ADA does not require supervisors to act
civilly to their employees, Johnson requested a transfer because
he allegedly was being harassed because of his disability which
prevented him from functioning in a job for which he was

-21-

otherwise qualified and capable of performing.  The cases
defendant cites to support his argument involve dissimilar claims
or plaintiffs not qualified to do their jobs.  In Gaul v. Lucent
Tech., Inc., 134 F.3d 576 (3d Cir. 1998), for example, the
plaintiff did not allege that he was being harassed by his
supervisor on the basis of his disability, but merely that his
supervisor was causing him stress.  Id. at 578.  The court ruled
that requiring the employer to provide a stress-free workplace
for the plaintiff was not a reasonable accommodation.  Id.
at 581.  Here, Johnson was not asking for a guaranteed stress-
free workplace, but merely for a work environment in which he was
not harassed on the basis of his mental disorder.  A jury could
find that this was a request for a reasonable accommodation.
Similarly, the plaintiff in Gonzagowski v. Widnall, 115 F.3d 744
(10th Cir. 1997), did not allege harassment based on disability.
Id.  Nonetheless, the court in Gonzagowski specifically noted
that "specific stressors in a work environment may in some cases
be legitimate targets of accommodation."  Id. at 747.  In this
case, a jury could find that the harassment Johnson alleges was
the kind of specific stressor which could reasonably be
accommodated by a transfer.

     In other cases cited by the defendant in which a plaintiff
with a claimed disability requested a transfer to avoid a certain
level of stress, the claimed disability was so severe that the

-22-

normal level of stress involved in the job was too much to handle.  See Pesterfield v. TVA, 941 F.2d 437, 441 (6th Cir. 1991); Carozza v. Howard County, Md., 847 F. Supp. 365, 368 (D. Md. 1994).  In both of those cases, the court ruled that the plaintiff was not qualified to do the job at issue.  Id.  In this case, by contrast, plaintiff apparently demonstrated that he was capable of performing the job once he was no longer forced to work under supervisors who he claimed harassed him daily because of his bipolar disorder.  When Johnson returned to work in 1995, he no longer worked with or around Bodnaruk or Swora (Pl.'s Mem. at 8-9.), but continued in that position without incident until he voluntarily left for another job on December 3, 1997.  (Def.'s Stmt. ¶ 13.)

The Seventh Circuit decision in Duda noted the distinction "between claims of personal conflicts with others, or mere temperament and irritability, which do not amount to 'disabilities' under the ADA, and medically diagnosed mental conditions . . . which are recognized disabilities under the ADA."  Duda, 133 F.3d at 1059 (footnote omitted).  Plaintiff here has alleged that he was diagnosed with a recognized mental illness – – bipolar disorder.  He has provided doctor's reports and recommendations to support that contention.  Because there is evidence on which a reasonable jury could base a finding for the plaintiff, defendant's arguments for summary judgment fail.

-23-

2. Intentional discrimination under the ADA

To establish a claim of intentional disability discrimination, an ADA plaintiff may use the McDonnell Douglas burden-shifting frame-work, first making a prima facie showing that "'he had a disability within the meaning of the ADA, that he was qualified for the position with or without a reasonable accommodation, and that he suffered an adverse employment action because of his disability.'" Duncan v. WMATA, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (quoting Swanks v. WMATA, 179 F.3d 929, 934 (D.C. Cir. 1999)); accord Aka v. Washing Hosp. Ctr., 156 F.3d 1284, 1288 (1998) (applying the burden-shifting frame-work to ADA claims). Here, plaintiff asserts that a pervasively hostile work environment due to his disability altered the terms and conditions of his employment, constituting the adverse employment action.[4] Defendant does not directly address whether plaintiff's work environment was hostile, but instead defends against plaintiff's intentional discrimination claim by asserting that plaintiff has not made a prima facie showing that he is a disabled individual under the ADA. (Def.'s Mem. at 13-16; Def.'s Supp. Authority at 2-3.)

---

[4] In the plaintiff's motion for partial summary judgment, he appears to attempt to assert a claim for retaliation relating to his claim for hostile work environment. (Pl.'s Mem. at 19-20.) The complaint did not plead retaliation as a cause of action.

-24-

Although district judges in the District of Columbia have recognized an ADA hostile work environment claim for at least a decade, the District of Columbia Circuit Court has never explicitly decided that the cause of action exists.  See Kuraner v. Mineta, No. 00-5416, 2001 WL 936369 (D.C. Cir. July 10, 2001) (assuming without deciding the existence of the cause of action and affirming judgment for the defendant in Kuraner v. Slater, Civ. A. 98-0576 (D.D.C. Sept. 13, 2000)); Pantazes v. Jackson, 366 F. Supp. 2d 57, 71 (D.D.C. 2005) (denying summary judgment on an ADA hostile work environment claim because a jury could reasonably find the acts alleged to be "sufficiently severe, pervasive and abusive to alter the conditions of [plaintiff's] employment, thereby creating an abusive working environment"); Henry v. Guest Services, Inc., 902 F. Supp. 245, 252 n.9 (D.D.C. 1995) ("This Court accepts that the Title VII standard — harassment so severe or pervasive as to alter the conditions of employment and create an abusive working environment — is applicable to harassment allegations made under the ADA."). Faced with a case of first impression, the Fourth Circuit had "little difficulty in concluding that the ADA, like Title VII, creates a cause of action for hostile work environment harassment."  Fox v. Gen'l Motors Corp., 247 F.3d 169, 176 (4th Cir. 2001) (finding the parallel language of Title VII and the ADA to warrant the same interpretation, and concluding that jury

verdict on ADA hostile environment claim was supported by the evidence).  Other circuits, too, have assumed without deciding that such a cause of action exists.  See, e.g., Silk v. City of Chicago, 194 F.3d 788, 804 (7th Cir. 1999); Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 667 n.2 (3d Cir. 1999) (collecting cases that presume the existence of such a cause of action and stating that the court found no cases holding that the claim did not exist); Wallin v. Minn. Dep't of Corr., 153 F.3d 681, 688 (8th Cir. 1998) (assuming without deciding that cause of action exists); Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir. 1998) (discussing merits of evidence in support of claim); McConathy v. Dr. Pepper/Seven-Up Corp., 131 F.3d 558, 563 (5th Cir. 1998) (assuming without deciding that cause of action exists).  Even courts not affirmatively ruling that an ADA cause of action for hostile work environment exists have recognized that an ADA cause of action for hostile work environment is consistent with both the Supreme Court's interpretation of the nearly identical language in Title VII in Patterson v. McClean Credit Union, 491 U.S. 164, 180 (1989), and the remedial goals of the ADA, which aims to eliminate discrimination based on disability and create equality in the workplace.  See, e.g., Silk, 194 F.3d at 803; Walton, 168 F.3d at 666.  This court, then, will accept that a plaintiff who alleges that his employer intentionally created a pervasively

-26-

hostile work environment because of the employee's disability
states a cause of action for intentional discrimination under the
ADA.

To establish such a claim, plaintiff has to allege that:

> (1) he is a qualified individual with a
> disability; (2) he was subjected to unwelcome
> harassment; (3) the harassment was based on
> his disability; (4) the harassment was
> sufficiently severe or pervasive to alter a
> term, condition, or privilege of employment;
> and (5) some factual basis exists to impute
> liability for the harassment to the employer.

Fox, 247 F.3d at 177; accord Pantazes, 366 F. Supp. 2d at 71.

As is reflected in the discussion above, plaintiff has made
a prima facie showing that he is a qualified individual with a
disability of bipolar disorder.  He has also made a prima facie
showing that he was subjected to unwelcome harassment and that it
was because of his disability that he was harassed.  Plaintiff
alleges that he "experienced personal hostility and harassment"
at work daily.  (Pl.'s Mem. at 19, 21.)  He states that his
supervisors, Bodnaruk and Swora, completely alienated him by
refusing to speak to him after he requested a transfer.  (Id.
at 20.)  He further alleges that they directed others not to
speak to him so that communication occurred by notes placed on
the plaintiff's chair.  (Id.)  According to plaintiff, Bodnaruk
made disparaging remarks about the plaintiff and his medical
condition (id.), and set out to ruin his reputation.  (Id. at 5.)
Bodnaruk often ignored the plaintiff's requests for resources

such as office supplies, fax codes, or computer work-space.  (<u>Id.</u>
at 21.)  Plaintiff alleges that the hostile conduct intensified
after he requested a transfer.  Plaintiff further states that
this harassment interfered with his ability to work and with his
productivity to such an extent that it altered the terms of his
employment.  (<u>Id.</u>)

Johnson's characterization of his experience must be viewed
in the light most supportive of his claim and, in that light, is
not insufficient to make a prima facie showing.  If Johnson was
ostracized at work because of his disability, if he was subjected
to daily disparaging conduct by his supervisors because of his
disability, if he was denied basic resources to do his work
because of his disability, and if he was blocked from advancement
opportunities due to disability-based animus, a reasonable jury
could conclude that Johnson was subjected to a hostile work
environment so extreme as to alter the terms and conditions of
his employment.  Furthermore, it is entirely possible that
discovery in this case could yield additional evidence bearing on
this claim.

Finally, plaintiff has advanced evidence that the employer
knew of the harassment.  In 1994, plaintiff, through his doctor,
informed the Library that he wanted a transfer because his
supervisors' conduct was exacerbating his mental disorder to the
point that his medication was not effective to maintain his

equilibrium.  (Pl.'s Mem. at 4.)  After Johnson's leave in 1994
triggered by his disorder, the defendant did in fact temporarily
detail the plaintiff to another assignment upon his return.  From
this evidence, a reasonable jury could find that the defendant
was aware of the alleged harassment.  Taking all factual
assertions and inferences in the light most favorable to the
plaintiff, a jury could find that through Bodnaruk and Swora, the
defendant created a hostile work environment for this plaintiff
in violation of the ADA.

On the other hand, plaintiff also states that Bodnaruk
engaged in heated arguments with "all other staff members," that
she made demeaning remarks to staff members and that she tended
to "select a scapegoat to focus on for a period of time."  (Pl.'s
Mem. at 19.)  These facts undermine the plaintiff's claims.  No
cause of action is available against an employer whose
supervisors engage in generally unpleasant behavior toward
employees equally.  The plaintiff must show that he was subjected
to harassment <u>because</u> he was disabled.  <u>Fox</u>, 427 F.3d at 177;
<u>Pantazes</u>, 366 F. Supp. 2d at 71.  Because the evidence on this
element is conflicting, summary judgment is not warranted for
either party on the hostile work environment intentional
discrimination claim.

-29-

B.  <u>Plaintiff's Motion</u>

Plaintiff argues that because the Department of Labor found that he had a disability, he is entitled to summary judgment here as to liability.  (Pl.'s Stmt. Ex. 6.)  ADA liability, however, is not established by mere proof of disability.  In any event, Labor's findings are not preclusive against the Library because the Library was not a party to that proceeding.  <u>See</u> <u>Ethnic Employees of the Library of Congress v. Boorstin</u>, 751 F.2d 1405, 1409 (D.C. Cir. 1985) (stating that issue preclusion will not apply against an entity that was not present for the prior proceeding).

Summary judgment in the plaintiff's favor is also inappropriate because material facts remain at issue. Specifically, the parties dispute the extent to which plaintiff suffered from bipolar disorder and the extent to which the defendant was aware of the plaintiff's need for accommodation. As is stated above, plaintiff argues that his evidence shows that his bipolar condition is of long standing, and that defendant was aware of both his medical condition and the need for a job reassignment.  Defendant argues that the plaintiff did not provide the Library with information sufficient to ascertain the extent to which the condition interfered with plaintiff's major life activities and the consequent need for a reasonable accommodation.  (Def.'s Mem. at 15-16.)  Defendant also places

-30-

great weight on the same letter from the plaintiff's doctor, which also stated that the plaintiff could perform his duties "with no special accommodations."  (Pl.'s Stmt. Ex. 16.) Defendant takes this clause to mean that the plaintiff was not disabled because he did not need to be accommodated in order to work.  Defendant disputes that plaintiff was harassed because of his disability.

The parties clearly have differing interpretations of the evidence on this issue and in particular of the April 11, 1995 letter from plaintiff's treating physician.  Given the legitimate dispute about the nature and extent of the plaintiff's disability, defendant's awareness of it, the consequent need for a reasonable accommodation, and whether his disability motivated his supervisors' alleged animus, summary judgment is unavailable.

<u>CONCLUSION AND ORDER</u>

Defendant sat on his right to assert that plaintiff failed timely to exhaust his administrative remedies.  Thus, defendant's motion to amend his answer and his motion to dismiss plaintiff's action for failure to exhaust administrative remedies timely will be denied.  Because the parties dispute material facts in this case, both the plaintiff's motion for partial summary judgment and the defendant's motion for summary judgment will be denied. Therefore, it is hereby

-31-

ORDERED that the defendant's Motion to Amend Answer [19] be, and hereby is, DENIED.  It is further

ORDERED that the plaintiff's Motion for Partial Summary Judgment [7] be, and hereby is, DENIED.  It is further

ORDERED that the defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment [11] be, and hereby is, DENIED. It is further

ORDERED that plaintiff's Request for Status Conference [32] be, and hereby is, GRANTED.  A separate Order for an initial scheduling conference will be issued.

SIGNED this 28th day of September, 2005.

_____/s/_____
RICHARD W. ROBERTS
United States District Judge